# HILLSBOROUGH,

## JULY TERM, A. D. 1856.

---

### STATE *v.* JOHNSON.

In an indictment on the statute for concealing the goods of a debtor, to prevent their being taken for his debts, it is no defence to show that the defendant, at the time of the concealment, held the goods under a fraudulent mortgage from the debtor, duly executed and recorded.

Nor that the defendant, previous to the concealment, was summoned as trustee of the debtor in a process of foreign attachment, which was pending at the time of the concealment.

To show that the goods concealed were the property of the debtor, within the meaning of the statute, it is competent to prove that a mortgage, previously made of the same goods to the defendant, by the debtor, was fraudulent, though the taking of such mortgage by the defendant was a distinct statutory offence.

Spirituous liquors may be taken on mesne process or execution, and sold on execution for the debt of the owner.

INDICTMENT on the statute, alleging that the defendant, on the 15th day of October, 1854, concealed one half pipe of dark brandy, of the value of $354, one half pipe of pale brandy, of the value of $284, and 44 gallons of port wine, of the value of $88, the personal property of Frank B. Johnson, with intent to prevent its being taken on mense process, or in execution.

It appeared on trial that in June, 1854, Frank B. Johnson, a brother of the defendant, was trading at Manchester on a small stock of fancy goods, and late in that month, or in July following, commenced trading at that place in spirituous liquors, still continuing his trade in fancy goods.

VOL. XXXIII. 29

On the 8th of June, 1854, F. B. Johnson purchased of Orcutt & Co., at Hartford, Ct., liquors to the amount of about $420, which were forwarded to Manchester, but not delivered from the railroad to F. B. Johnson until July 19, 1854. On the 17th of June he bought of Aaron Bean, at New-York, liquors to the amount of about $1250, which were delivered to him at New-York, a few days later. On the 12th of July he made another purchase of liquors from Bean, amounting to about $450. On the 31st of July he purchased of Orcutt & Co. liquors to the amount of about $130, and on the 24th of September to the amount of about $441. All these liquors were forwarded to F. B. Johnson, at Manchester, and were bought on credit, the first payment falling due about October 20, 1854.

Several suits were brought against F. B. Johnson by Bean, and Orcutt & Co., and by his other creditors, the first being a suit by Sumner & Co., commenced October 11, 1854, and the second by Bean, commenced October 21, 1854, and the liquors remaining in F. B. Johnson's store, and the stock of fancy goods, as also his interest in real estate at Manchester and at Portsmouth, were attached, and the evidence tended to show that no other property of his could be found to be attached. The defendant claimed the goods so attached under sales or mortgages from F. B. Johnson, and has sued the officer for taking them.

On the 28th of October the defendant was summoned as the trustee of F. B. Johnson, in one of the suits, in which the property of F. B. Johnson was attached, and that trustee process, as well as two others commenced afterwards, are still pending.

On the 4th of October, 1854, F. B. Johnson made a mortgage to the defendant, duly executed and recorded, to secure a note for $600, bearing date the 3d day of October. The property mortgaged was described in the mortgage as follows: " One half pipe, 71 gallons, Otard brandy, $276.96 ; one quarter pipe, 44 gallons, old port wine, $107.80 ; one half pipe, 86 gallons, dark brandy, $258. The mortgage did not state where the property mortgaged was situated, nor contain any further description of it.

In stating their case the counsel for the State said they expected to show that at the time when the mortgage was made to the defendant, F. B. Johnson was largely indebted, and, beside the property claimed by the defendant, had not the means to satisfy his debts : That early in October the defendant obtained leave from the owner of a carpenter's shop on a back street in Manchester, to store the liquors described in the indictment in his lower shop, used to store lumber, &c., representing that the casks contained cider ; that the liquors were put there by the defendant the early part of October, 1854, and kept concealed there until Sunday, the 7th of January, 1855, when he caused them to be removed and carried to Cass's Crossing, in Candia, about ten miles from Manchester, on the Portsmouth railroad, and carried thence, marked " Vinegar," by the railroad to Portsmouth ; that the mortgage to the defendant was fraudulent, being made and taken to defraud the creditors of F. B. Johnson.

To show that the mortgage was fraudulent, the counsel for the State offered to prove that F. B. Johnson obtained the liquors purchased, as is before stated, on credit, with the fraudulent design of disposing of them before the credit should expire, so that they could not be taken for his debts ; that the largest part of the liquors, instead of being kept to be used in his business at Manchester, were disposed of and sent away, in pursuance of this fraudulent design ; that the defendant knew of this fraudulent scheme when he took his mortgage, and took the mortgage and concealed the property to assist in carrying this scheme into effect ; that in order to obtain his goods for this fraudulent purpose, F. B. Johnson, when he made his first purchase of Bean, falsely represented that he was worth at least $10,000.

The defendant objected to all this evidence, and particularly to the representations of F. B. Johnson made to Bean, and also contended that as he was in possession of the goods charged to have been concealed, under his mortgage, and was summoned as the trustee of F. B. Johnson, the goods were not liable to be taken on mesne process, or in execution for the debt of F. B. Johnson, and therefore could not be concealed with the intent

alleged in the indictment. The court overruled these objections, and the defendant excepted.

Evidence was then introduced tending to show that on the 11th of July, 1854, the defendant sent from the station at Cass's Crossing, by the railroad to Portsmouth, directed to himself, one pipe, one half pipe, six barrels and two kegs, all marked *vinegar*, and also two boxes of merchandize, all estimated to weigh 6000 pounds; that there were casks in the purchases of liquors by F. B. Johnson, before mentioned, corresponding in description with those sent by the defendant to Portsmouth. No other evidence was introduced by either side to show where the defendant obtained these casks, or what they contained.

That in the month of July, about the same time, John W. Johnson, another brother of the defendant, residing in Portsmouth, being in Manchester, where the defendant had resided since 1853, took a sale from F. B. Johnson of two half pipes of brandy and gin, two quarter casks of brandy, two forty gallon casks of whiskey, and a quantity of Havana and Principe cigars, amounting to twenty or thirty thousand. These liquors and cigars were taken by J. W. Johnson from the shop of F. B. Johnson, carried to Cass's Crossing, and thence over the Portsmouth railroad to Portsmouth, and removed out to the farm where J. W. Johnson lived, about two and one half miles from the town, and the liquors stored there in the cellar; that the head of these casks, a part or the whole, were painted with black paint over the name of F. B. Johnson; that John W. Johnson took this conveyance upon the suggestion and by the advice of the defendant.

That John W. Johnson, in September of the same year, took from F. B. Johnson a conveyance of his stock of fancy goods, and soon after transferred them to the defendant, who had them in his possession when they were attached, and claimed them under this sale.

That on the 19th of August, 1854, the defendant took from F. B. Johnson a mortgage of his house in Manchester, to secure a note of the same date for $625. No evidence was given of the consideration of this note.

State *v.* Johnson.

Evidence was also introduced on the part of the State to show that some time in October, 1854, the liquors described in the indictment were put by the defendant under the carpenter's shop before mentioned; that while there, part of the heads of the casks were painted over black, to conceal, as was contended on the part of the State, the name of F. B. Johnson, and, as the defendant contended, to prevent leakage; that on Sunday evening, the 9th of January, the defendant had the liquors taken from the carpenter's shop and conveyed to Cass's Crossing, where they arrived about eight o'clock the next morning, and on the next day were sent over the railroad by his order to Portsmouth, marked *vinegar,* and directed to "*N. B. Johnson.*" After they arrived at Portsmouth they were attached in a suit by Orcutt & Co. against F. B. Johnson, in which the defendant was summoned as trustee.

That when F. B. Johnson made his first purchase of Bean he represented that he was worth at least $10,000; that the debts of F. B. Johnson amounted to something over $4000; that no property not claimed by the defendant could be taken to pay his debts, except an equity of redemption in some real estate at Manchester, and an undivided interest in some real estate that had belonged to his parents.

There was other evidence tending to show the fraud and concealment set up on the part of the State, and the defendant introduced evidence to show that the liquors described in the indictment had been kept by F. B. Johnson in his barn, because he had not convenient room for them in his shop; that about the first of October he leased his barn, and on that account removed the liquors, and left them some days by the side of the back street, in a public and exposed situation, until they were removed into the carpenter's shop, which was near; and also, other evidence tending to contradict and explain the evidence of the State.

It was conceded on the part of the government that if the defendant's mortgage of the goods was valid, and covered the goods, F. B. Johnson had no attachable interest in them to the value of $100.

The court instructed the jury that to maintain the prosecution they must be satisfied that the property described in the indictment, or a part of it, to the value of one hundred dollars, was concealed by the defendant to prevent it from being seized or attached on mesne process, or in execution, and that the property so concealed was the property of Frank B. Johnson.

That if the mortgage under which the defendant claimed was made and taken to defraud the creditors of F. B. Johnson, the goods mortgaged would remain the property of F. B. Johnson, within the meaning of the statute and the allegation of the indictment.

That if the jury believed, on the evidence, that F. B. Johnson, when he commenced purchasing the liquors, formed the design to obtain them on credit, and before the debts became due to dispose of them so that they could not be taken for his debts, and thus to defraud his creditors ; that in order to obtain goods on credit for that purpose he fraudulently represented to Bean that he was worth more than he was in fact ; that the different conveyances and mortgages made by him of his property were made to carry this fraudulent purpose into effect ; that the defendant knew of this fraudulent design when he took his mortgage, and had concurred and aided in any of the previous fraudulent transactions connected with this scheme, they might receive these facts as evidence tending to show that he took the mortgage in question with the same fraudulent purpose, and that the mortgage was fraudulent and void ; that the single question in this part of the case was whether this mortgage was honest and fair, or fraudulent and void as to creditors, and all the other facts and circumstances were to be regarded only as evidence bearing on that point.

That the concealment must be such as actually concealed the property from the creditors and the officers who acted for them, so that with ordinary diligence the property could not be discovered ; that the defendant must have done some positive act to effect the concealment ; that a mere neglect to inform where the goods were would not be sufficient.

The jury returned a verdict of guilty, which the defendant moved to set aside for the following reasons :

1. Because the court permitted evidence to be given of Frank B. Johnson's declaration in June, 1854, as to his property ; of the consignment of a load of goods at Candia, for Portsmouth, July 11, 1854, to N. B. Johnson ; his first connection with the goods named in the indictment being in October, 1854.

2. Because the court permitted evidence to be given that the mortgage was fraudulent ; the record of the mortgage being notice that the respondent held the property in his possession, and that there can be no concealment in law until he has been requested by a creditor or his agent to point out the property, and he refuses.

3. Because N. B. Johnson had been summoned as trustee of F. B. Johnson, had taken possession of the liquors, and is chargable therefor as trustee for the amount above his mortgage, and for the whole amount, if the mortgage was fraudulent, and if so, the property was not thereafter liable to attachment.

4. Because the property, under the circumstances of the case, was not liable to attachment.

*Clarke & Bell*, for the defendants.

I. The declarations of Frank B. Johnson as to the amount of his property ought not to have been admitted as evidence against the defendant.

It is assumed on the part of the State that there was a conspiracy between these parties to conceal the property of F. B. Johnson from attachment, and that these declarations should be received as evidence of the general scheme.

The broad rule where there is a conspiracy we take to be this : " The acts and declarations of other persons with whom the defendant has conspired, may, *if referable to the issue*, be given in evidence against him." Ros. Cr. Ev. 60. Here the respondent is charged with concealing from attachment certain specific articles ; and the point directly in issue is, whether he did conceal those articles. We submit, then, that the declarations of

F. B. Johnson as to his property prior even to the purchase by him of the articles charged to have been concealed, can, by no process of reasoning, be referred to the point in issue. Indeed, it is twice removed, for it does not tend to the point that the mortgage was fraudulent, which point we also claim is foreign to the issue raised by the pleadings.

We contend, also, that on a trial for a conspiracy the acts and declarations of other persons beside the respondent cannot be given in evidence, unless concert and connection between the parties be first shown. (2 Russell on Crimes 697.) But no such concert or connection is here shown. Thus, on the grounds assumed on the part of the State, it would seem this evidence was not admissible. But we think the rule is limited to cases where a conspiracy is charged in the indictment, or arises by a necessary implication from it, and that, generally, statements of third persons must have been made in presence of the prisoner, to be received. See *Rex* v. *Hearne et al.*, 4 C. & P. 215; *Rex* v. *Fletcher et al.*, 4 C. & P. 250; *Regina* v. *Shellard*, 9 C. & P. 277; *Rex* v. *Winkeworth*, 4 C. & P. 444; *Noonan* v. *The State*, 4 U. S. Dig., Evid., 1210; *Blackwell* v. *Davis*, 4 U. S. Dig., Evid., 1244; *State* v. *Poll*, 4 U. S. Dig., Evid., 1245; *Hunter* v. *Commonwealth*, 12 U. S. Dig., Evid., 283.

II. The evidence that the respondent, on the 11th of July, 1854, sent certain casks, marked " vinegar," to Portsmouth, directed to himself, was not competent to be submitted to the jury; because—

1. This act was in no way connected with the alleged concealment, and cannot be referred to the point in issue.

2. If in fact it were a concealment of other property, and offered to show an intent to defraud, it would not be competent evidence. *Viney* v. *Barss*, 1 Esp. 293; *Bell's Case*, cited in Cowen's & Hill's Notes to Phil. Ev., N. 347, p. 626; *Walker* v. *Commonwealth*, 1 Leigh 574, cited as above; *Keith* v. *Taylor*, 3 Vt. 153; *Cole* v. *Commonwealth*, 10 U. S. Dig., Evid., 300; *Rex* v. *Westwood et al.*, 4 C. & P. 547; *United States* v. *Mitchell*, 2 Dall. 357; *Wilton* v. *Edwards*, 6 C. & P. 677.

III. The court erroneously permitted evidence to be given that the mortgage from F. B. to N. B. Johnson was fraudulent.

1. The same statute that makes it a crime to conceal property from attachment, also makes it a crime to receive a fraudulent mortgage, and we say with *Morton, J., Commonwealth* v. *Call,* 21 Pick. 515, 522, " Proof of any one crime cannot be introduced to support the charge of another." See, also, *Rex* v. *Vandercomb,* 2 Leach Cr. C. 816, stated in 2 Ed. 1 Phil. Ev. 178, and cases cited under our 2d point.

2. To receive this evidence will be practically disregarding the Constitution both of the State and the United States. Article 15 of the Bill of Rights provides that " no subject shall be held to answer for any crime or offence until the same is fully and plainly, substantially and formally, described to him." Now the case finds that on the part of the State it is conceded that, unless the mortgage is fraudulent, and therefore void, it covers the property to its full value, and the indictment cannot be sustained. It would seem clear, then, that in point of fact the respondent was tried for receiving a fraudulent mortgage, and that, if he cannot be convicted on this charge without proof of a conspiracy between him and Frank B. Johnson, his offence has not been described to him in the manner prescribed by the Constitution. We say, also, that, whether the receiving a fraudulent mortgage is a distinct crime or not, wherever a fraud is necessary to be proved it must be described in the indictment with all the particularity necessary to maintain an indictment for a cheat or fraud at common law. If this ruling is to stand, moreover, this respondent is in danger of being twice put in jeopardy for what amounts to the same offence and by the same evidence.

We submit, also, that no authority can be found for receiving such testimony, and that it could not have been the intention of the legislature, when they provided a punishment for the offence of receiving a fraudulent mortgage, that the guilty person should be subject to additional punishment for that offence, by another provision, creating another offence, and providing therefor the amount of punishment due to it.

3. This evidence is wholy immaterial and irrelevant to prove the crime charged in the indictment, and described by the statute. We maintain that, to constitute the offence charged, there must be an actual hiding away of the property, so that the officer cannot find it; that the property must remain the debtor's, and be secreted as his; (and we claim here that the mortgage is valid between the parties, and that by it the property passed from F. B. Johnson to the respondent,) for the statute has made it another offence to conceal property from the creditor, by making or receiving a fraudulent mortgage, pledge or conveyance thereof. This last provision is applied equally to real and personal estate; but as there was another way to prevent the creditor from securing his debt on the personal estate, viz., by secreting it, so that the officer could not make an attachment thereof, *this* secreting was provided against and made by the statute a distinct offence from the other, and it was for this the prisoner was indicted; and we maintain that an indictment therefor cannot be supported by proof of a fraudulent mortgage of the property, any more than an indictment for receiving a fraudulent mortgage by proving that the prisoner had buried the property of the debtor in his garden, so that the officer could not find it to make an attachment.

4. Before the State be permitted to give evidence of fraud on the part of the respondent, it ought to be shown that the creditor or his agent had made due search and inquiry for property belonging to F. B. Johnson. The mortgage of the property in question to the respondent, being recorded, was notice to all the world that he had the property, and the fact that he was not requested to point out the property and give an account of his claim, rebuts any presumption of fraud on his part. We think, also, that there could be no concealment in law of the property by him until he had been thus inquired of respecting it.

IV. The property, under the circumstances of this case, was not liable to attachment.

1. The respondent has been summoned as the trustee of F. B. Johnson, and we think it to be the law that when property is mortgaged, and the mortgagee is summoned as trustee of the

mortgagor, the property is not liable to attachment.  *Aldrich* v. *Woodcock and Trustees*, 10 N. H. 99, 103.

And it makes no difference whether the mortgage was valid or not.  If valid, then F. B. Johnson's interest was only the value of the property over and above the mortgage, and the respondent was liable for that; on the other hand, if the mortgage was fraudulent, the respondent is held as trustee for the whole value of the property.

2. There is no evidence that a demand was made of the respondent, as required by chap. 184, sec. 16 of the Revised Statutes, and we contend that the property could not be attached until such demand was made.  At the most, it could only be held by the officer while he made the demand, and if he failed to make it there would be no attachment.

3. Property not liable to be taken on execution is not liable to attachment.  Comp. Stat., ch. 199, sec. 1.  All personal property taken on execution must be sold by the officer at public auction, and to the *highest* bidder.  Comp. Stat., ch. 207, sec. 3. The indictment alleges the concealment of certain *wines and liquors.*

It is provided by Laws of 1849, chap. 846, sec. 1: " That the selectmen of the respective towns shall license one or more suitable persons to sell wine and spirituous liquors, for medicinal, mechanical and chemical purposes, and for *no other use or purpose.*"  All persons not thus licensed are liable to a fine if they sell liquors for any purpose.  Ch. 177, sec. 6, Rev. Stat. ; ch. 849, sec. 2, Laws 1849.

" If a statute inflicts a penalty for doing an act, the penalty implies a *prohibition,* and the thing is unlawful, though there be no prohibitory words in the statute."  4 Kent 467.  Therefore it is illegal for an officer or any body, licensed or unlicensed, to sell liquors at public auction to the highest bidder; and therefore the liquors named in the indictment were not liable to be attached, and could not in law be concealed from attachment.

*B. F. Ayer,* Solicitor, for the State.

1. The accusation against the respondent is so connected with the situation, transactions and purposes of his brother, Frank B. Johnson, that the acts and declarations of each, when referable to the point in issue, may be given in evidence. Being associated for the same illegal purpose, every act and declaration of each, in pursuance of the original design, and with reference to the common object, is, in contemplation of law, the act and declaration of both. It makes no difference when the respondent entered into the conspiracy. He was, in law, a party to every act which had been previously done by his brother, to promote the common object. 1 Greenleaf on Evidence, sec. 111; Wharton's Am. Crim. Law 261, 2; Roscoe's Crim. Evidence 84, 5, 6, 7 and 90; 2 Starkie on Evidence 233; Archbold's Crim. Pleading 676, 7; 1 Phillips on Evidence (Cow. & Hill's Ed.,) 199, 200, 201; *Am. Fur Co.* v. *United States,* 2 Peters 365; *Commonwealth* v. *Crowninshield,* 10 Pick. 499; *Burke* v. *Miller,* 7 Cush. 550.

"In all offences which involve a conspiracy, not only the acts of the defendant himself, but also all the acts of his accomplices, done in furtherance of the common object, no matter where committed, may be given in evidence against him." Archbold's Crim. Pleading 105; Roscoe's Crim. Evidence 418.

It makes no difference as to the admissibility of the acts and declarations of Frank B. Johnson, that he is not joined with the respondent in this indictment, nor that their offences may have been, under the statute, distinct, as they constitute the same transaction. Wharton's Am. Crim. Law 263; Roscoe's Crim. Evidence 83; 3 Phillips on Evidence (Cow. & Hill's Ed.) 209, notes; Roscoe's Crim. Evidence 418.

2. To constitute the offence charged, the intent and the act must both concur. There must also appear the concurrence of a fraudulent design in both parties implicated. This intent may be proved either by direct or indirect evidence tending to establish the fact. It is not necessary that the evidence in proof of intention should apply directly to the particular act charged. 3 Greenleaf on Evidence, secs. 13, 15; Wharton's Am. Crim. Law

232; Roscoe's Crim. Evidence 95; 1 Phillips on Evidence (Cow. & Hill's Ed.) 472, 3, 4; 2 Starkie on Evidence 416, 17; *Bridge* v. *Eggleston,* 14 Mass. 245; *Foster* v. *Hall,* 12 Pick. 89; *Lovell* v. *Briggs,* 2 N. H. 223; *Whittier* v. *Varney,* 10 N. H. 291; *Clement* v. *Brooks,* 13 N. H. 95; *Blake* v. *White,* 13 N. H. 267; *Demerrit* v. *Miles,* 2 Foster 523.

If these positions are sound, they conclusively dispose of the first exception raised by the respondent. All the evidence therein alluded to had a direct bearing upon the question of intention.

It was also clearly admissible as tending to impeach the validity of the mortgage set up by the respondent.

3. Evidence to impeach the mortgage was properly admitted on two grounds: First, as tending to show a fraudulent intention on the part of both parties to cover up the property in question; and secondly, and more particularly, because the respondent set up the mortgage in his defence, and attempted to justify his conduct by it.

The suggestion that the record of a mortgage is notice that the mortgagee holds the property in his possession, is quite erroneous. If the description is sufficiently explicit, it is notice that the mortgagee holds a claim upon certain property in the possession of the mortgagor. In this case, however, the description is so loose and insufficient as to furnish notice of scarcely anything.

The position that there can be no concealment in law by a mortgagee until he is requested by a creditor of the mortgagor to point out the mortgaged property, and he refuses, has no foundation in law or reason. No reason can be assigned why a mortgagee, and especially a fraudulent mortgagee, should be entitled to any more forbearance or treated with any more ceremony than any one else.

The jury have in this case found a concealment in fact. They have authoritatively pronounced the mortgage to be a fraud and a sham. The respondent acquired no rights by it, and cannot be permitted to shelter himself under it.

4. The third exception taken by the respondent is in substance, that the property in question was not liable to attachment because he had been summoned as the trustee of Frank B. Johnson, and was chargable for it under that process, and that, therefore, it could not have been concealed with the intent alleged in the indictment.

This position will not bear the test of examination. In the first place, the case does not find that the concealment did not occur or commence before the service of the trustee process; and after verdict it will be presumed that those facts, implied in or inferable from the finding of the jury, were proved at the trial. 1 Greenl. Ev., sec. 19; *Kelton* v. *Bevins,* Cooke 90; *Burnett* v. *Maxey,* 9 Porter 410; *Easton* v. *Fisher,* 1 Pike 90; *Elswick* v. *Newsome,* 9 Dana 260; *Morgan* v. *Livingston,* 2 Richardson 573; *Sewall's Falls Bridge* v. *Fisk & Norcross,* 3 Foster 180; *Lisbon* v. *Bath,* 1 Foster, 335; *Gould* v. *White,* 6 Foster 188.

In the second place, the case shows that the respondent did not take the property into his possession until the 9th of January, more than two months after the commencement of the trustee process on the 28th of October. Up to that time, therefore, the respondent could not have been chargable as trustee. During this interval the property remained concealed, and was clearly liable to attachment and seizure.

In the third place, if the property was in the respondent's possession at the time of the service of the trustee process, and he might have been chargeable therefor, it was nevertheless subject to attachment and seizure in a subsequent suit. The trustee suit might fail, or be relinquished, or the judgment, if any should be recovered, might be satisfied, without resorting to this property in the hands of the trustee. In either of these cases the property could have been held and applied on the subsequent attachment. It could be attached on a subsequent writ in the ordinary way, subject to the lien created in favor of the respondent by his liability as trustee, without resorting to the process of foreign attachment. Otherwise, in case the trustee should prove

dishonest or insolvent, the creditor might derive no benefit from his attachment. The property in question was, in fact, so attached upon a subsequent writ in favor of Orcutt & Co. *v.* F. B. Johnson.

Again, the trustee process is itself a method of attachment. It is sufficient if the property were concealed to prevent its being reached by either method. The object of concealment is to keep it from the reach of creditors. If effectually secreted, they can neither seize it or charge any one for it as trustee.

5. The whole case shows, and the verdict conclusively establishes the fact, that the respondent concealed the property in order to place it beyond the reach of any process the creditors of Frank B. Johnson might resort to, whether a trustee process or a common attachment. By reference to the instructions given to the jury, it will be seen that the jury must have found the respondent guilty of some positive act, to effect the concealment of the property from the creditors, and the officers who acted for them, so that with ordinary diligence it could not be discovered.

PERLEY, C. J. If the mortgage to the defendant was fraudulent, the property mortgaged was liable to attachment and execution for the debts of Frank B. Johnson, without regard to the mortgage. The creditor might treat it as a nullity. *Angier* v. *Ash*, 6 Foster 109.

If the mortgage was fraudulent, the goods mortgaged would be the property of the debtor, within the meaning of the statute. They might be taken for his debt, and, in pleading his justification for taking them, the sheriff or creditor would allege that they were the property of the debtor, and proof of the fraud would maintain the plea. The manifest intention of the statute was to punish a fraud, contrived to prevent a creditor from resorting to the property of his debtor for the satisfaction of his debt, in cases where the law gives him that right; and where the creditor has the right to take goods as the property of his debtor, they must be regarded as his property, within the meaning of the statute. The act must be construed with refer-

State *v.* Johnson.

ence to the mischief designed to be suppressed, and the right intended to be protected.

It was conceded on trial, as the case shows, that, if this mortgage was valid, F. B. Johnson had no attachable interest to the value of one hundred dollars in the goods alleged to have been concealed. To prove the case laid in the indictment, it was therefore material to show that the mortgage was fraudulent, and the property liable to be taken without regard to it. To prove that the mortgage was fraudulent was part of the evidence necessary to establish the fact alleged in the indictment, that the goods were the property of the debtor, within the meaning of the statute.

The fact that the defendant had made or received a fraudulent mortgage would not, standing by itself, be evidence that he was guilty of a fraudulent concealment, whether of the same or of different goods. But if another crime be so far connected with the proof of a relevant and material fact, that the fact cannot be shown without introducing evidence of the other crime, the evidence, though it may establish the other crime, is admissible. *Com.* v. *Call,* 21 Pick. 522. And that is this case. To make out the material allegation, that the property of the debtor to the value of one hundred dollars, was concealed, it was necessary to show that his mortgage to the defendant was fraudulent, and proof of that fact cannot be shut out, because the evidence necessarily shows that the defendant had been guilty of another offence in taking the fraudulent mortgage. Was the evidence introduced by the government competent to prove that the mortgage was fraudulent ?

Evidence of other sales and dispositions of his property by the debtor, to defraud his creditors, so connected in time and circumstances as to constitute parts of a general scheme of fraud, is competent to prove that the transaction immediately in question was fraudulent.

The conduct and declarations of a grantor respecting the estate conveyed, and tending to prove a fraudulent intention on his part before the conveyance, is proper evidence for the jury

upon an inquiry into the validity of the conveyance. *Bridge* v. *Eggleston*, 14 Mass. 245.

It is established practice to admit evidence of a debtor's disposition of his estate, made at or about the same time, to show a fraudulent purpose in the debtor to injure his creditors. So, where the charge was the procurement of goods by a fraudulent conspiracy, testimony was admitted of other transactions of the supposed conspirators, soon after, to prove a probable intent and combination to defraud in the first case. *Lovell* v. *Briggs*, 2 N. H. 223.

In *Whittier* v. *Varney*, 10 N. H. 294, it is said, " evidence tending to show a fraudulent intent on the part of G. D. Varney," (the debtor,) " and the defendant, about the time of the failure, and of the subsequent conveyance of the property in question to the defendant, would render it probable that the property was conveyed under the influence of that intent; and the evidence to show other fraudulent conveyances, by G. D. Varney, through other persons, to the defendant, about the time of his failure, had a legitimate tendency to show such an intent and purpose. Such evidence might well lead to a probable belief that the transfer of the lands now in question had been made to cover them from creditors, in part execution of the fraudulent purpose."

Pretended transfers of property are always made with the forms of a real sale, and evidence is always ready to show a due execution of bills of sale, and a delivery of the property. This evidence it is necessary to rebut, and it can only be done by showing various circumstances in the control and management of such property, and the situation and means of the parties, their previous dealings with and knowledge of each other, and in certain cases the dealings of the vendor with others as to other property, at or about the same time, even without the knowledge of the vendee." *Blake* v. *White*, 13 N. H. 271; *Angier* v. *Ash*, 6 Foster 400.

In order to avoid a sale of goods on the ground of false and fraudulent conduct in the vendee, in representing himself to be

a man of good property and credit, when he was not so, it is competent to give evidence of similar false pretences successfully used to other persons in the same town, about the same time, to show a general plan to amass property by fraud. *McKenney* v. *Dingley*, 4 Greenl. 172. In the present case the evidence went to show that F. B. Johnson, the debtor, commenced the purchase of liquors on the 8th of June, 1854, upon a false representation of his ability to pay; and from this the inference might be fairly drawn that when he bought the goods he did not expect nor intend to pay for them, and that he then entertained the design to defraud his creditors.

The jury would be well warranted in finding that the casks sent over the railroad to the defendant, on the 11th of July, 1854, contained liquors belonging to the stock of F. B. Johnson; as they agreed in general description, were marked and sent in the same way as the others, which were proved to have been part of that stock; and especially as the defendant, who must have known where he got the casks, and what they contained, does not undertake to give any account of them.

The liquors were all bought by F. B. Johnson on credit, and before the price of any purchase fell due, the evidence tended to show that he had disposed of all these goods, and his other personal property, and the bulk and substance of his real estate, without making provision for any of these debts, and leaving a large amount of debts beyond his ability to pay, if these sales and mortgages should be held valid.

Almost immediately on receiving the goods he proceeded to dispose of large portions of them to this defendant and another brother; and the goods in the fancy shop, sold originally to his other brother, soon after came to the hands of the defendant and are now claimed by him.

The jury might well find on this evidence that these different sales and mortgages were fraudulent in F. B. Johnson, being intended to prevent the property from being taken for his debts, and that they were all parts of one general fraudulent design. They form a connected series, all relating to the same general

subject, and the time they cover was not longer than the execution of the scheme required.

The evidence was therefore competent to show the fraud of F. B. Johnson in making the mortgage in question.

But, in order to charge the defendant with the fraud of F. B. Johnson, it was necessary to show that when he took his mortgage he knew of the fraud, and concurred in it. To make the proof of particular transactions, other than the mortgage itself, evidence against the defendant, it was not necessary that he should, when he took the mortgage, have notice of the particulars; it would be enough if he were acquainted with the general scheme.

In *Foster* v. *Hall*, 12 Pick. 100, it is said, " they (the creditors) ought to have been allowed to show, if they could, by the acts as well as by the declarations of the grantor, prior to the conveyance in question, that he had a fraudulent design, without requiring them to prove knowledge on the part of the demandant (the vendee,) of the particular acts of the grantor, from which such intent on his part was to be inferred."

The knowledge by the mortgagee of the mortgagor's fraud is not, of course, required to be proved by direct evidence. It may be inferred from the circumstances, and the circumstances in this case were quite sufficient to show the knowledge and concurrence of the defendant in the fraudulent scheme of F. B. Johnson. They were brothers. The evidence went to show that a large amount of F. B. Johnson's goods were sent over the railroad to the defendant in July, 1854. The defendant advised his brother to take a conveyance of the stock of fancy goods, and those goods soon after came into the possession of the defendant, and are claimed by him. The defendant took a mortgage of F. B. Johnson's house in August, 1854. Almost all the property of F. B. Johnson went into the hands of this defendant and another brother, and the brother took his share with the knowledge and by the advice of the defendant. All this was quite enough to warrant the jury in finding that the defendant had knowledge of any fraud meditated by F. B. Johnson, and concurred in the scheme.

Evidence that at the time when the goods were alleged to have been fraudulently concealed, there was a scheme on foot to dispose of F. B. Johnson's property, so that his creditors could not reach it for the satisfaction of their debts, and that the defendant was a party and confederate in the scheme, would be competent evidence, bearing directly on the main question in the case, viz: whether the goods were fraudulently concealed, as charged in the indictment.

Some of the facts proved were of an equivocal character; they were introduced to prove an intentional concealment of the goods, but were capable of another interpretation. The goods, for instance, were removed from F. B. Johnson's shop to the barn. Was this done to conceal them from his creditors, or because there was not convenient room in the shop? So, for what purpose were they removed into the back street, and under the carpenter's shop? The heads of the casks were painted over. For what purpose: to conceal the name of F. B. Johnson, or to stop leakage? They were taken on Sunday and carried in the night to Cass's Crossing. To conceal them from the creditors, or because they were wanted immediately in Portsmouth? It was incumbent on the government to show that these acts were *intended* to conceal the goods. The intent was an essential ingredient of the offence charged in the indictment.

If at the time there was on foot, and in the course of execution, a general scheme to defraud the creditors of F. B. Johnson, by concealing and covering up his property, and the defendant was one of the confederates in that scheme, that fact would have a legitimate tendency to show the *quo animo* with which the acts directly connected with the charge of concealment were done. The evidence was quite competent to show that the property was in such a situation that the creditors did not in fact, and could not by ordinary diligence, find it. They were actually deprived of an opportunity to attach the property by the manner in which the defendant kept and managed it. Was it his intention that his acts should have this effect? The fact that he was then engaged in a general plot to keep all the property of F. B.

Johnson from his creditors, must be competent evidence tending to show that his intention was the same in respect to this particular part of it. As in the case of a charge for obtaining goods on fraudulent pretences, other frauds of the same kind, committed by the defendant about the same time, may be proved. *McKenney* v. *Dingley*, 4 Greenl. 172 ; and on an indictment for passing counterfeit money, it may be found that the defendant had passed other counterfeit money before, to show knowledge and guilty intent. The fraudulent mortgage and the fraudulent concealment are distinct acts, and are made by the statute distinct offences, and may both be committed in reference to the same property. Personal property mortgaged, even when the mortgage is *bona fide* and valid, is liable under our statute to be taken, subject to the mortgage, for the debt of the mortgagor ; and when the mortgage is fraudulent it may be taken without regard to the mortgage. If the property has been first fraudulently concealed, it may be afterwards fraudulently mortgaged, and *vice versa*. One man might take a fraudulent mortgage and another fraudulently conceal the property mortgaged. Both would be within the terms and within the meaning and mischief of the statute ; and if two different men might be guilty of the two separate offences in reference to the same property, it is not easy to see any reason why the same man might not be.

The ground is taken for the defendant, that the offence could not be committed, because, at the time of the concealment, the defendant had been summoned as trustee of Frank B. Johnson, the debtor, in a process of foreign attachment still pending, and that the property, being under attachment by that process, was not liable to be taken in *mesne process*, or in execution. As the mortgage in this case must have been found by the jury to have been fraudulent, it stands as if the goods had been in the defendants' possession, without any title or claim ; and in such case, under our statute, he would be chargeable for them as trustee, and bound to deliver them over on an execution against him. The evidence tends to show a concealment before the service of the trustee process, and also a concealment continued afterwards.

We cannot know whether the jury found the fact of the concealment to have taken place before or after the service of the process, and it is very probable that they did not undertake to settle the time. We must, therefore, understand, in favor of the defendant, that the concealment commenced after the service of the process.

Under the instructions given to the jury we must take it on this case that the property was actually concealed, so that the creditors could not take it, and that it was concealed for the purpose of preventing them from taking it for the satisfaction of their debts. The purpose and the guilty intention would reach to all cases in which the property might be legally taken for the debts of the owner, whether in execution or *mesne process*. It would not be necessary that the creditor should have the power to take the property immediately, and at the time of concealment. If his debt were not yet due, or were in suit, and judgment not then recovered, and the property were concealed in advance, to prevent its being taken at a future time, it is very clear that the case would be within the statute. If the concealment were made to prevent the creditor from exercising his right to take the property of his debtor for the satisfaction of his debt, whether that right were immediate or prospective, absolute or contingent, it would be a wrong meditated upon the creditor, and within the statute. If the concealment in this case were shown to have been before the debts of F. B. Johnson fell due, and before the creditors had power to take the property or to commence suits, but was intended to defeat the right of the creditors to take the goods when their demands should become due, it cannot be contended that the act would not be within the statute. So, after their suits were commenced and the *mesne process* returned, they could not take the property of F. B. Johnson for their debts until those suits were discontinued, or they had received judgment on them. But if, while things remained in that state, the property of F. B. Johnson were concealed to prevent its being taken in new suits, if those then pending should be discontinued, or in execution, if judgment were recovered, it would be concealed

to prevent its being attached in *mesne process*, or taken in execution, within the language and the mischief and meaning of the statute.

The property in the hands of the trustee might be liable to be attached, or taken in execution in various ways and on numerous contingencies. The same creditor that had summoned the defendant as trustee, might discharge him pending the suit, and in that case the property might be taken on the execution issued in that suit, or by another creditor, or the suit in which the trustee was summoned might be wholly discontinued. In the same suit, the creditor, after summoning the trustee, might, it would seem, attach the property of the principal defendant in his hands, and hold it. The attachment taking the property out of the trustee's hands would be regarded as the act of the plaintiff, and discharge the trustee *pro tanto*, and the property would be held under the attachment. Such we understand to be the doctrine of *Goddard* v. *Hapgood*, 25 Vt. 351.

So we cannot doubt that another creditor might attach the goods in the hands of the trustee, and maintain that the trustee suit was collusive and fraudulent, and that no debt was due to the plaintiff in that suit.

The position of the plaintiff requires him to maintain that if the goods of a debtor, however large in amount, were, by a fraudulent assignment, or any other fraudulent contrivance, placed in the hands of another to keep them from creditors, and one creditor, for a debt however small, should summon the party in possession of the goods as trustee, the only remedy left to the other creditors would be to serve other processes of foreign attachment, and trust to the chance of charging the trustee, and of finding the property to take in execution, when they had recovered judgment. We think it would be extremely dangerous to hold such a doctrine.

In Massachusetts the statutes regulating the trustee process are not in all respects like ours, and the cases in that State may not be directly in point here. It is held there, that where one who has the goods of another in his hands, is summoned as his

trustee, the same goods are liable to be attached by another creditor, and the officer will hold them subject to the lien of the creditor who has sued the trustee. *Burlingham* v. *Bell*, 16 Mass. 321; *Platt* v. *Brown*, 16 Pick. 553; *Rockwood* v. *Varnum*, 17 Pick. 289, and I think we should hesitate long before we decided that in this State, where a large amount of property was placed in the hands of an assignee to keep it from creditors, a single trustee process, for a trifling amount, or perhaps collusive, would take from all the other creditors their right of resorting to the property itself under our attachment laws.

Suppose the trustee, pending the process, and in anticipation of being charged, should conceal the property of the debtor which was in his hands, to prevent its being taken on the execution which he expected would issue in the suit, this would be a concealment of the debtor's property to prevent its being taken in execution for his debt. These are some of the numerous ways in which the property of a debtor in the hands of a party summoned as his trustee may be liable to be taken for his debt. If in this case the defendant, being summoned as trustee, concealed the property of F. B. Johnson to prevent its being taken, then or at any future time, for the debt of the owner, it was a wrong aimed against the rights of the creditors, within the terms and the intent and obvious meaning of the statute. To constitute the offence it would not be necessary that the defendant should have in mind any particular creditor, or any particular mode or time of taking the goods. It would be enough if the concealment were made with the general purpose of keeping the property from creditors. It may be observed, though not, perhaps, material to the decision of the legal question, that the creditors of F. B. Johnson did in fact, when these goods were discovered, attach them instead of relying on the trustee process, and in a case like this the chance of charging a trustee who had fraudulently concealed the property in his hands, and of realizing the debt, if he were charged, would in practice be a remedy of trifling value. It is to be apprehended that it would go far to disarm this provision of the statute of its principal remedial force

to hold, that when goods are in the hand of a fraudulent trustee he may safely conceal them so that they cannot be taken by the same or other creditors for their debts. The objection that a trustee process was pending against the defendant cannot prevail.

The fact that there was a recorded mortgage of the property to the defendant would not prevent it from being concealed. Even if the mortgage had so described the property that it could be easily known and distinguished when found, the mortgage and record would not assist to find it, if removed and hidden away, and in this case there was nothing to distinguish the property mortgaged from other property of the debtor of the same description. There was nothing in the description of the property mortgaged that would lead the creditor to understand or suspect that it was at the barn, or in the back street, or under the carpenter's shop. As between the parties it would probably be competent to show, by intrinsic evidence, what particular property was intended to be mortgaged under the general description. But it may well be doubted whether, when the mortgagor has various articles of property answering to the general description in the mortgage, and a part are mortgaged without designating which, so that the creditor, with ordinary diligence, might know what particular property was meant, the mortgage, under our registration law, would be valid against creditors. *Dunning* v. *Stearns,* 9 Barb. S. C. Rep. 630.

We cannot see how a demand by the creditor on the defendant can constitute any part of the statutory offence of concealing the debtor's property.

Spirituous liquors are property, and as such are under the protection of the law. *Fuller* v. *Bean,* 10 Foster 181.

The general provision of the statute makes the property of a debtor liable to be taken in *mesne process* and in execution for his debts, with certain enumerated exceptions. We cannot think that the law relating to the sale of spirituous liquors was intended to have the effect of protecting that species of property in the hands of the owner against the right of the creditor to take it for his debt. If taken in *mesne process* or execution, such property

must be held and disposed of according to law, like other property. If an attempt should be made under color of legal process to evade the law regulating the sale of spirituous and intoxicating liquors, the form of the proceeding might not protect the officer. But the officer is ordered by his precept to take the property of the debtor; the liquors are his property; they are not exempted by any positive law, nor, we think, by any implication from the law relating to the sale of spirituous liquors; and the officer would be warranted by his writ in taking them, and in selling them fairly on execution, to satisfy the debt, under the general provisions of the law on that subject.

*Judgment on the verdict.*